**Irene WALKER, Plaintiff,**

v.

**Joseph CALIFANO, Secretary of Health, Education and Welfare, Defendant.**

No. C–C–76–235.

United States District Court, W. D. North Carolina, Charlotte Division.

Aug. 3, 1978.

George L. Fitzgerald, Charlotte, N. C., for plaintiff.

Harold M. Edwards, U. S. Atty., W. D. North Carolina, Asheville, N. C., for defendant.

### ORDER

McMILLAN, District Judge.

This case is before the court for review of a final decision of the Secretary of Health, Education and Welfare denying plaintiff's applications for disability insurance benefits and supplemental security benefits. Plaintiff's various applications were filed on October 9, 1973, December 3, 1973, and February 4, 1974. An earlier application, filed in 1972 and denied in 1973, is not involved in this case.

Plaintiff's applications were initially denied and denied again after reconsideration. She requested and was given a hearing before an administrative law judge. On the basis of the testimony at the hearing and the medical records in the file the administrative law judge determined that plaintiff had been disabled since April 26, 1971, that her disability had lasted and was

likely to last for a continuous period of more than twelve months, and that she was entitled to benefits.

*On its own motion* the Appeals Council ordered additional medical examinations of plaintiff and, on the basis of the record before the administrative law judge and the new medical information, reversed the decision awarding benefits.

Both parties have moved for summary judgment, and the case is now ready for decision. The only issue is whether the Secretary's decision is supported by substantial evidence in the record. For the reasons which follow I conclude that it is not and that the decision of the Appeals Council should be reversed.

At the time of the hearing before the administrative law judge plaintiff was fifty years old, five feet four inches tall and one hundred and seventy-four pounds. She had spent twenty eight years working as a winder operator in various cotton mills and, in the last two years of employment, had worked briefly as a waitress and then as a change maker at a pool room and an amusement park. She had no formal education beyond the fifth grade. Plaintiff claimed that she had become disabled as of April, 1971, due to spinal arthritis, stomach trouble, nerves, hernia, "filling up with fluid," muscle spasms, an enlarged liver, a stab wound and goiter.

The administrative law judge based his decision not so much on the objective findings regarding plaintiff's claimed physical impairments as on the evidence in the record with respect to emotional or psychological disability. He stated:

"The medical evidence of record furnished us with diagnoses of degenerative disc disease, goiter, and carpal tunnel syndrome, most of which do not seem to be severe enough to be causing claimant's alleged symptomatology. She is, however, being treated with multiple drug therapy including Darvocet, Tylenol, Robaxin, phenobarbital, Choledyl, thyroid, diuretics, ear drops, penicillin, etc. Certainly claimant sincerely believes she is acutely ill and it was apparent that she does have arthritic swelling on the distal joints of her fingers. It is also apparent that claimant suffers from severe emotional problems which have been diagnosed as anxiety reaction, depression and conversion reaction. The vocational expert testified that claimant has been and is incapable of performing any work activity since April 1971 because of a combination of multiple physical and mental impairments. Due to claimant's limited education and intelligence, the prognosis for recovery is quite guarded even with psychotherapy."

Plaintiff's principal complaints at the hearing were her nervousness and her problems with her hands and her left arm. Plaintiff stated that she would frequently experience pain and weakening in her left arm and that the arm would "go dead." It was because of this problem with her arm that she stopped work as a winder operator. Since she last worked in April 1971, plaintiff had only once attempted to find another job. She was sent by the welfare department to a local hospital where she was given a job putting labels on bottles. Plaintiff testified that she had only worked one hour at the hospital and had been sent home because of the weakness and swelling in her hands and because she was "too nervous." Record p. 47. She stated that she had not been able to work as a waitress because she was too nervous to work around all the customers in the restaurant. Record p. 62. Her job as a change maker required her to wear an apron filled with coins and to walk around the grounds of an amusement park. She quit this job because the weight of the apron pulling on her back caused pain.

Plaintiff testified that the main sources of pain were in her lower back and in her shoulders and neck, radiating down into her arms. She claimed that her fingers would frequently swell and stiffen, making working with her hands difficult. The administrative law judge himself observed at the hearing that plaintiff's fingers were swollen. Record p. 71. Plaintiff stated that when her arm went dead she could not pick

up a cup of coffee, that she had difficulty standing for more than one hour and that she couldn't walk more than two or three blocks. She also mentioned a choking sensation due to her goiter condition. At the time of the hearing plaintiff was taking pain medication, tranquilizers, pills to reduce fluid accumulation, a muscle relaxant and medication for goiter.

Throughout the hearing her constant complaint was about the state of her "nerves." At one point in the hearing plaintiff's counsel remarked on her behavior:

"MRS. GREEN: I notice you keep working with your hands. Is that because they bother you, or because you're nervous?

"CLAIMANT: I'm nervous. I don't mean to be doing it."

Record p. 77. The administrative law judge's findings suggest that he, too, observed significant anxiety in plaintiff's behavior throughout the hearing.

In addition to plaintiff's own testimony the administrative law judge heard testimony from Dr. (Ph.D., psychology) George Demos, a vocational expert with experience in psychotherapy and counseling. Dr. Demos' opinion was unequivocal:

"*It is my opinion the claimant is, in my judgment, unable to work at any full-time gainful work activities.* The combination of the many impairments that she described that are also documented, some of which are documented in the medical evidence, coupled with the obvious emotional aspects of the case, the overlay of possible hysteria, conversion hysteria, which was indicated in the record and is obvious from her testimony; the necessity of taking heavy medication, particularly Triville [sic] 425, which is a [sic] antidepressant-tranquilizer combination, all of which indicates apparent emotional disturbance as well as physical impairments which would, as she indicated in her testimony, make it extremely difficult for her to relate with people, to stay at a job, even the most simple job such as she was tried out at, simply putting labels on bot-

tles, which is about as sedentary of work as one could find. Coupled with and in addition to that, the inability of finger dexterity, obviously her arthritic condition in her hands and the syndrome that she also has with the wrist and fingers, and affects her finger dexterity to such a degree where most of the jobs that a person with her background of experience could do, mainly sedentary or light assembly, inspection type jobs would require much more dexterity than she obviously has."

Record pp. 79–80. (Emphasis added.) Dr. Demos stated that it was apparent from the record and from plaintiff's testimony that psychotherapy would be helpful but could not make plaintiff employable. Record p. 81.

Medical evidence of plaintiff's impairments was provided primarily by records of treatment at Harbor General Hospital in Torrance, California, and at El Cerrito Hospital in Long Beach, California. These records covered the period from the middle of 1970 through the time of the plaintiff's first application.

Plaintiff had a goiter condition for which she was given iodine treatment in 1970. It was thought that she had possible hyperthyroidism, but none of the records reflect a serious condition. She had also had several gynecological operations leading to a complete hysterectomy. Again, none of the reports saw any association between these operations and plaintiff's principal symptoms. No significant heart or liver problems were diagnosed.

In 1972 plaintiff suffered a stab wound in her left shoulder. The wound healed normally, and she did not suffer any permanent neurological damage. Her shoulder and arm pain predated this wound. She suffered from mild diverticulitis in the colon which was effectively treated, and one report referred to chronic sinusitis. During a period in 1973 she was treated frequently for headaches and gastritis.

The precise cause of plaintiff's back pain was not clear. Dr. Sison termed her problem mild chronic lumbosacral strain and

recommended a back brace. There was an old fracture of the fifth cervical vertebra and a narrowing of the disc space. A 1971 radiological study found no significant arthritic changes; a 1974 radiological examination showed some straightening of the cervical spine possibly due to muscle spasm. Several reports contained impressions of possible osteoarthritis in the cervical spine and in the neck and shoulder area.

A hospital report dated February 3, 1973, contained findings consistent with bilateral carpal tunnel syndrome, a condition restricting sensation and flexion in the hands and fingers. Record p. 187. This condition was described as asymptomatic in a later report. Record p. 186.

A reading of the record against the findings of the administrative law judge shows that he was most impressed by plaintiff's anxiety and emotional reaction to her complaints and by her difficulties with her hands and her left arm.

On its own motion the Appeals Council ordered a consultative examination by Dr. William Buss. Dr. Buss' impression was summarized as follows:

"We feel this patient is obese. She has a mild goiter probably not active. She has a history of diverticulosis. She has osteoarthritis of her cervical spine. *We feel she is markedly psychoneurotic accounting for many of her complaints.* We do not feel she has heart trouble in spite of the positive x-ray of a slightly enlarged heart, we do feel that she most likely is dyspneic because of her obesity. We cannot account for any arthritic changes or all the many other various pains she has in her body."

Record p. 223. (Emphasis added.) Dr. Buss recommended a program to control plaintiff's obesity and thought that with a loss of weight she could return to work, avoiding heavy exertion. He also recommended psychiatric care, but he gave no consideration to how plaintiff was to integrate this care with the demands of a nine-to-five job or whether she would be employable even with psychiatric care. Dr. Buss was qualified in internal medicine; he made no rep-resentation that he understood the extent of plaintiff's psychological problems. His sole statement on the extent of her impairment was to note that "[p]sychologically and neurologically she is quite capable of *handling her own funds.*" Record p. 224.

Aside from the examination by Dr. Buss the Appeals Council had two doctors review the medical exhibits presented to the administrative law judge. Neither doctor conducted an examination of the plaintiff, as did Dr. Sison or Dr. Buss; neither doctor observed her behavior at the hearing, as did Dr. Demos and the administrative law judge. There was nothing at all in their analyses which was not already before the administrative law judge. One of the doctors, Dr. Cairo, was a specialist in psychiatry as well as internal medicine. He commented on plaintiff's psychological impairment as follows:

" . . . [T]he terms anxiety and anxiety neurosis have been used to describe the claimant's own subjective feelings of nervousness. A note explaining the fact that the claimant was attending a day-care program dated April 8, 1975, did not, in any sense, give particulars such as diagnosis, length of time she had been attending, and the basis for referral. Certainly there is no evidence the claimant has required psychiatric hospitalization which is the usual route to a day-care center.

"There is, in addition, no evidence the claimant's alleged nervousness has, in fact, been more than just that. There is no indication of such major psychopathological states such as psychosis or organic brain syndrome. There is no indication of bizarre behavior or perceptual difficulties.

"There is evidence the claimant tends to be intent on her self-assessed invalided state and that she tends to utilize historically, as proved diagnoses, whatever presumptive diagnostic studies are directed toward. Therefore she claims heart disease, thyroid disease, and etc., when, in fact, studies done regarding such entities have ruled out the disease in same."

334

Record pp. 218–19. Dr.Cairo failed to state whether the behavior he mentioned in the last part of his analysis might itself be indicative of neurosis, and whether such anxiety about plaintiff's physical condition might itself affect her ability to function in a job. *It is not necessary for plaintiff to show that her impairment results from an organic brain disorder or from a major psychosis in order to establish that she is disabled within the meaning of the relevant statutes.* See, e. g., *Whitt v. Gardner,* 389 F.2d 906 (6th Cir. 1968); *Kelly v. Matthews,* 420 F.Supp. 359 (W.D.N.C. 1976).

In contrast to Dr. Cairo's "paper opinion" is a statement from Drs. Bullock and Rapport, dated April 8, 1975. These two doctors saw plaintiff regularly; she was a daily participant in their therapy program at the Western Institute of Human Resources. Both doctors were of the opinion that plaintiff was *not* able to support herself (although they thought she might be able to do so in the future). Record p. 236. Also of record before the Appeals Council was a statement from Thomas E. Lawson, a psychiatric social worker with the Long Beach, California, department of health. Mr. Lawson, unlike Dr. Cairo, had been seeing plaintiff on a regular basis. His opinion was that plaintiff's combination of psychological and physical problems prevented her from working at all, and he noted that plaintiff had been previously hospitalized in a psychiatric setting. Record p. 238. Dr. Cairo apparently did not have this letter before him when he stated that there was "no evidence" of any such hospitalization.

Several exhibits submitted by plaintiff referred to her treatment by a Long Beach, California, psychiatrist, Dr. Lester Haentzschel. A letter dated February 11, 1976, from Dr. Haentzschel not introduced as an exhibit but submitted as part of the agency record, states that plaintiff has responded moderately well to various medications but that in Dr. Haentzschel's opinion plaintiff was disabled from any gainful employment. He noted that she was depressed and had many physical complaints. Record p. 15.

█ The Appeals Council relied exclusively on the examination report of Dr. Buss and the analyses of Drs. Herman and Cairo. It totally ignored Dr. Buss' impression of "marked psychoneurosis" and his recommendation of psychiatric care. There was no reference at all to the testimony of Dr. Demos or to the letters from Drs. Bullock, Rapport and Haentzschel or from Mr. Lawson, all of whom had seen plaintiff for an extended period and were of the opinion that she was not able to cope with the demands of a regular job. The Appeals Council did not consider how plaintiff could engage in regular employment and find time from work to continue her daily therapy sessions. The only job the Appeals Council suggested might be available to plaintiff was her former job as a change girl, a job she testified she left because she could no longer walk around the amusement park grounds for a full day carrying a coin-loaded apron. Finally, the Appeals Council made no mention of the evidence of restriction in plaintiff's use of her hands and fingers, which, as the administrative law judge observed, was one of her principal physical complaints.

Against this background the Appeals Council came to the remarkable conclusion that there was "no evidence of a serious emotional or psychiatric problem." Record p. 11. This finding is supported only by the slender reed of Dr. Cairo's summary of the medical exhibits, a summary whose defects are noted above. A review of the entire record leads to the conclusion that this finding is simply not supported by substantial evidence in the record.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment is granted and the Secretary's motion for summary judgment is denied. The decision of the administrative law judge is reinstated, and the case is remanded to the Secretary who shall compute and pay the benefits to which plaintiff is entitled.